UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

YAHTEEK MILES,

                              Plaintiff,

      v.                                                   3:04-CV-1147

COUNTY OF BROOME, DAVID HARDER, Broome
County Sheriff, in his Individual and Official Capacity,
PRIMECARE MEDICAL, INC., TERESA ANN
SACCO-BEDOSKY, VICKIE LYNN POTOCHNIAK,
MICHELE PARSONS, BETSY JEAN KUBO, HOPE
WOODCOCK, SUSAN VAZIRI-COHEN, and
JOHN and JANE DOE, Correctional Officers and
Medical Personnel,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

**I.     INTRODUCTION**

      Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 claiming that Defendants violated his constitutional rights by failing to provide him adequate medical care while he was incarcerated at the Broome County Correctional Facility.  Presently before the Court are Defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

**II.    FACTS**

      As of November 3, 2001, Plaintiff was incarcerated at the Broome County Correctional Facility ("BCCF").  On November 3 or 4, 2001, Plaintiff injured both of his wrists

while playing basketball. On November 4, 2001, Plaintiff presented to the medical facility at the BCCF.[1] Plaintiff complained that he broke both of his wrists and that he was in extreme pain. Plaintiff was examined by Defendant Michele Parsons, R.N. Parsons noted:

> mild edema post. aspect proximal from 2nd-3rd digit @ wrist. Limited ROM. 2° pain. Bilat. palp. [No] obvious deformities, . . . strong bilat. radial pulses easily palpated. Denies distal numbness/tingling - cap refills < 2 sec. No open areas/active drainage. No acute distress.

Parsons gave Plaintiff ice and ordered 400 milligrams of Advil. Parsons also placed Plaintiff on the physician's list for follow-up exam and reassessment.

On November 5, 2001, Plaintiff had a follow up visit at the medical facility. He was examined by Defendant Vicki Lynn Potochniak, a registered physician's assistant. According to the medical records, at this time, Plaintiff reported that his pain had decreased and he had increased movement in his wrists. Potochniak noted slight tenderness over the right distal radius with no swelling or deformity. The medical notes indicate that Plaintiff's left wrist had mild edema, full range of motion, and no obvious deformities. Plaintiff, however, testified that he recalled having swelling on both wrists. Potochniak further found that Plaintiff had a strong bilateral pulse to both wrists, good capillary refill, no acute distress, and Plaintiff denied any distal numbness or tingling. Potochniak diagnosed Plaintiff with bilateral wrist sprain, prescribed 800 milligrams of Advil (up from the 400mg previously given by Parsons), and recommended a follow-up in three to five days if pain persisted.

---

[1] Broome County contracted with Defendant PrimeCare Medical, Inc. to provide medical services to inmates at the Broome County Correctional Facility.

Later that date, Plaintiff was erroneously issued Darvocet. There is a factual dispute whether Plaintiff misidentified himself to acquire the medication.[2] As a consequence of Plaintiff's having taken the Darvocet, he was kept in the medical unit overnight for observation. There is no indication in the medical records that Plaintiff complained of wrist pain while he was retained in the medical unit. According to Plaintiff, however, he complained of wrist pain every time he went to the medical unit. The next day, November 6, 2001, Plaintiff stated that he was feeling fine and asked to be released from the medical unit. Plaintiff was released from the medical unit.

On November 16, 2001, Plaintiff requested to be seen at the medical unit. In his request, Plaintiff complained of headaches and stomach cramps. He made no written mention of pain in his wrists. Plaintiff's medical records also indicate that Plaintiff was seen for headaches and stomach cramps. There is no mention in the medical records of Plaintiff having complained of wrist pain. At deposition, however, Plaintiff testified that he complained of wrist pain, but was ignored.

On November 19, 2001, Plaintiff was again seen in the medical unit in response to complaints of headaches and stomach cramps. Again, none of the written medical records indicate that Plaintiff complained of wrist pain. At deposition, Plaintiff testified that he listed headaches and stomach aches on his medical request form to get into the medical unit to have his wrists tended to. Plaintiff further testified that, once in the medical unit, he complained of wrist pain, but was ignored.

---

[2] This factual dispute is immaterial to the issues before the Court. For purposes of this motion, the Court will assume that Plaintiff did not misidentify himself for purposes of acquiring another inmate's medication.

On November 21, 2001, Plaintiff was transferred out of the BCCF. On January 9, 2002, Plaintiff had a radiological consultation of his right wrist. Ellen Czajka, M.D. concluded "negative right wrist. . . . There is no bone, joint or soft tissue abnormality demonstrated." On February 20, 2002, Plaintiff had another radiological consultation of his right wrist. Rosa V. Samson, M.D., concluded had the following impression:

> No definite fracture of the distal radius and ulna as well as the carpal bones in the views available, however, the views are markedly limited in technique. Followup examination with better technique is recommended. There are multiple artifactual densities possibly produced by the fluid for developing the films.

Dr. Samson concluded "[t]here is no gross fracture of the navicular bones identified, however, the navicular views are not completely optimal." On February 28, 2002, Plaintiff under went further radiological consultation. The impression of Edward Larow, M.D., was:

> 1. Questionable fracture at the base of right fourth metacarpal as described. . . .
>
> 2. No right scaphoid fracture identified. If the patient has had a history of fracture I would assume it is healed. There is some sclerosis of the proximal pole of the right scaphoid as described in the body of the report.
>
> 3. Healing at left scaphoid fracture with only a small transverse component seen dorsally. There is no significant displacement. There is however some mild sclerosis of the proximal pole of the left scaphoid as described.

A further radiological consultation by Ellen Czajka, M.D. and dated March 20, 2002 concluded "negative left wrist. negative right wrist." Dr. Czajka found no bone, joint or soft tissue abnormality in either wrist. Plaintiff has not sought any further medical treatment for his wrists since being discharged from Butler Correctional Facility.

Based on the foregoing facts, Plaintiff contends that Defendants exhibited deliberate indifference to his serious medical needs. Plaintiff argues that, by failing to order

X-Rays for his wrists and failing to immobilize his wrists, Defendants violated his Eighth Amendment rights. Plaintiff further contends that Defendants failed to respond to his repeated complaints of continued severe pain.

### III.     STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings,

Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

## IV.     DISCUSSION

### a.     Admissibility of Dr. Tirgan's Affidavit

Before proceeding to the substance of Defendants' motions, the Court will first address Plaintiff's cross-motion to extend the time for the disclosure of an expert witness. Pursuant to Fed. R. Civ. P. 26(a)(2) and the Court's pre-trial scheduling order, Plaintiff had to disclose any expert witnesses on or before September 1, 2005. Plaintiff did not do so.

Pursuant to Fed. R. Civ. P. 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." Exclusion is automatic unless Plaintiff can demonstrate substantial justification for the failure to disclose or that the failure to disclose is harmless. The Second Circuit has instructed courts to apply the following factors: (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. Patterson v. Balsamico, --- F.3d ----, 2006 WL 459260 at *8 (2d Cir. 2006).

### 1. Plaintiff's Explanation For Failure to Comply with the Disclosure Requirement

Plaintiff states that he was not aware that he needed an expert until such time as he took the deposition of Defendant Potochniak, which, upon the consent of the parties, was

conducted after the close of discovery. The Court finds this explanation to be deficient. In his Complaint, Plaintiff asserted claims of a medical malpractice and a violation of his Eighth Amendment rights. As such, it was reasonably certain that the case would involve medical testimony. Furthermore, Plaintiff should have been aware that some of the named Defendants are health care professional who treated Plaintiff and, therefore, were likely to testify about their treatment and Plaintiff's medical condition. Aside from cross-examining these Defendants, Plaintiff should have been alerted to the likelihood that he would need his own health care professional to discuss the extent of Plaintiff's injuries or pain (to establish the "serious injury" element of his Eighth Amendment claim) and to discuss the proper response to Plaintiff's injury (to establish the "deliberate indifference element of his claim."). This need should have been obvious well before the deposition of Defendant Potochniak.

In any event, Potochniak's deposition was taken on December 15, 2005. According to Plaintiff, it was at that time that he should have been aware of the need for his own expert. Nevertheless, Plaintiff did not move for an extension of time until he was faced with the pending motions for summary judgment. Stated otherwise, Plaintiff did not seek leave to disclose an expert until two months after he claims to have realized the need for an expert. Accordingly, Plaintiff has failed to satisfy this element. See Patterson, — F.3d at —; see also Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 961 (2d Cir. 1997).

### 2. The Importance of the Testimony of the Precluded Witness

In his request to disclose an expert after the cut-off- date, Plaintiff does not address the importance of the testimony of the precluded witness. Id. Having reviewed the affidavit of the proposed expert, Dr. Tirgan, it can be gleaned that the expert is offered to counter

Defendants' contentions that Plaintiff was afforded appropriate treatment. Because, however, the medical malpractice claims have been dismissed as untimely, the issue of proper medical treatment is no longer at issue here. What is relevant is whether Plaintiff sustained a serious medical injury known to Defendants to which they responded with deliberate indifference. In his affidavit, Dr. Tirgan states that: (1) "[t]he standard of care for patients suffering severe trauma to their wrists is immediate immobilization of the wrists, obtaining X-Rays and a referral to orthopedic surgeon. . . ."; (2) immediate mobilization for fractured wrists limits pain and facilitates the healing process; (3) untreated wrist fractures would cause long lasting pain and discomfort; and (4) that Plaintiff did sustain a fracture in each wrist. While these points are not insignificant and may address the issue of whether Plaintiff was suffering from a serious medical condition,[3] they do not address the other core issue of whether Defendants acted with deliberate indifference. Thus, while this factor may weigh in favor of Plaintiff, the Court finds that it does not do so overwhelmingly.[4]

### 3. Prejudice to Defendants

In his motion, Plaintiff does not address the issue of any prejudice to Defendants. The Court finds that, for the following reasons, allowing the late disclosure of an expert witness would prejudice Defendants. Defendants had no idea Plaintiff intended to use an expert witness until they received Plaintiff's opposition to the motions for summary judgment. Id. If the Court allowed Plaintiff to now designate an expert witness, Defendants likely would

---

[3] Plaintiff would, of course, still have the ability to use Plaintiff, the Defendants themselves and Plaintiff's medical records to establish the appropriate standard of care, any pain suffered by Plaintiff, and any resulting deformities or injuries caused by Defendants' conduct.

[4] This is further supported by the fact that Dr. Tirgan is unfamiliar with Plaintiff's full medical history and he never examined or spoke with Plaintiff.

be burdened with having to review the expert report, deposing the expert, finding a rebuttal expert, and sitting through a deposition of the rebuttal expert. See Softel, 118 F.3d at 962 ("[A]ny differences between [the testimony of the expert witnesses] . . . would have redrawn the boundaries of the case and almost certainly have prejudiced [the defendant's] ability to meet [the plaintiff's] attack. Because [the defendant] would have been forced, at a very late date in the discovery process, to accommodate potentially significant shifts in the theories being offered against it, this factor cuts in favor of [exclusion]."). That would cause Defendants significant additional time and expense.

Furthermore, Defendants have expended time and money in filing properly supported motions for summary judgment. The motions were filed after the close of discovery when it reasonably could be anticipated that there would be no surprises such as a new expert witness. To allow Plaintiff to use Dr. Tirgan without affording Defendants the opportunity to address his testimony would clearly be prejudicial to Defendants. To allow Plaintiff to name an expert witness at this late stage would essentially force Defendants to undergo the additional expense of having to redo their motion papers to address any matters raised by Dr. Tirgan and then refile their motions for summary judgment. This is a significant burden. This factor weighs against Plaintiff.

### 4. Possibility of a Continuance

In his motion, Plaintiff also did not discuss the possibility of a continuance. Of course, in nearly every case a continuance is possible. Here, however, a continuance is not warranted. Discovery has been closed for several months. Plaintiff waited at least two months after the deposition of Potochniak before requesting to disclose an expert witness. Thus, Plaintiff had plenty of time within which to work.

Further, there are several motions for summary judgment that are currently pending before the Court. Plaintiff's opposition relies, in part, upon the assumption that Dr. Tirgan's affidavit is admissible. Allowing a continuance at this point would effectively require the Court to stop working on these motions, allow the parties to conduct additional expert discovery, and refile the motions. This is a waste of judicial resources. Moreover, this case currently is scheduled for trial in June 2006. Granting a continuance to allow additional expert discovery is likely to cause significant delay. In the interest of controlling the Court's docket and ensuring the timely disposition of cases, the Court finds that a continuance is not warranted. See Softel, 118 F.3d at 962-63 ("Had the court granted a continuance for [the plaintiff], it probably would have had to grant additional time for [the defendant] to respond. When trial courts permit deadline slippage of this sort, trials cannot be scheduled when they ought to be, resulting in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds."). Accordingly, this factor also weighs against Plaintiff.

For the foregoing reasons, the Court finds that Dr. Tirgan's affidavit is not admissible.

### b.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Plaintiff's claim that his Eighth Amendment rights were violated while he was incarcerated clearly falls within the statutory exhaustion requirement. See Porter v.

Nussle, 534 U.S. 516, 122 S. Ct. 983 (2002); Williams v. Comstock, 425 F.3d 175 (2d Cir. 2005).

Plaintiff appears to concede that he never filed a grievance in connection with his medical treatment at the BCCF. He argues, however, that filing a grievance would have been futile because: (1) "[he] was still attempting to get medical services and was last seen on November 19, 2001;" and (2) he was transferred out of the BCCF on November 21, 2001. Neither of these arguments are availing.

Pursuant to 9 N.Y.C.R.R. § 7032.4(d), "[a]n inmate must file a grievance within five days of the date of the act or occurrence giving rise to the grievance." Here, Plaintiff is contending that his wrists should have been immediately immobilized and that he should have been immediately referred for an X-Ray. Thus, his primary gripes pertain to matters that occurred on or about November 3, 4, and 5. Moreover, he contends that he repeatedly complained about his wrists, but was ignored, thereby prompting him to request sick call visits on November 12 and 15. According to Plaintiff, his requests were ignored, which led him to request further sick call visits ostensibly for headache and stomach pains, but allegedly intended by Plaintiff to get him into the medical unit where he could then complain of pain to his wrists.

Based on these facts, if Plaintiff believed his wrists should have been immediately mobilized or he immediately be taken for an X-Ray, then his grievance in this regard accrued by November 5, 2005. His grievance about being ignored about his wrists accrued by November 15 at the latest, at which time Plaintiff should have been well aware that Defendants did not intend to do anything for his wrists other than give him ice and prescribe pain killers. There is no basis upon which to conclude that his continued unsuccessful efforts

to get Defendants to do more for his wrists tolled the time within which he was required to file a grievance or constituted separate grievances.

Plaintiff's transfer to another facility is similarly irrelevant. As discussed, Plaintiff should have filed a grievance within five days of the accrual of his gripe. Plaintiff was not transferred out of the BCCF until after he had the opportunity to file a grievance. Because Plaintiff did not timely file a grievance before his transfer and he had the opportunity to do so, he failed to exhaust his administrative remedies. Accordingly, Plaintiff's Complaint must be dismissed for failure to exhaust his administrative remedies.

    **c.**    **Eighth Amendment Violation**

Assuming, *arguendo*, that Plaintiff was not required to exhaust his administrative remedies, his Complaint must, nonetheless, be dismissed. "[A] prisoner claiming a denial of adequate medical care in violation of the Eighth Amendment must allege and ultimately prove that prison officials acted with deliberate indifference to a serious medical need." McKenna, 386 F.3d at 436-37 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). As the Second Circuit has stated:

> A prisoner must satisfy two requirements-one objective and one subjective-in order to prevail on such a "deliberate indifference" claim. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). First, the prisoner must prove that the alleged deprivation of medical treatment is, in objective terms, "sufficiently serious" - that is, the prisoner must prove that his medical need was "a condition of urgency, one that may produce death, degeneration, or extreme pain." See Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind," Chance, 143 F.3d at 702 (quotation omitted). This requires that the prisoner prove that the charged official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994).

Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005).

It is highly dubious that Plaintiff can establish a sufficiently serious medical need. Without question, Plaintiff did suffer some trauma to his wrists. There is no evidence that Plaintiff's condition was likely to cause death. There similarly is an absence of evidence that his condition was likely to cause degeneration. There is no medical evidence in the record that Plaintiff's wrists did not heal completely or properly. Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir. 2003) ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.").

With respect to the issue of continued pain, Plaintiff testified that he was continuously in severe pain. This testimony is contradicted by the medical records. Although the medical records indicate that Plaintiff complained of pain on November 4 and 5, there are no later complaints of pain in the records. In fact, Plaintiff was retained in the medical unit overnight from November 5 to November 6 due to the erroneous drug incident. The next day, November 6, Plaintiff told the personnel in the medical unit that he felt fine and that he wanted to return to the housing unit. There is no evidence in the medical records that Plaintiff again complained of wrist pain to any of the *named* Defendants. Although Plaintiff did request subsequent medical visits, those requests pertained to headaches and stomach aches. Nevertheless, construing the facts in the light most favorable to Plaintiff, the Court will assume that Plaintiff has satisfied this element.

Assuming Plaintiff can establish a serious injury, no fair minded trier of fact could reasonably conclude that Defendants acted with deliberate indifference. Plaintiff presented

to the medical unit on November 4, 2001 complaining of injuries to his wrists.  Defendant Parsons, a nurse, examined Plaintiff's wrists and believed them to be strained.  Accordingly, she arranged for Plaintiff to be given ice for the swelling, pain killers for the pain, and recommended that he be seen by a physician.  Even assuming Parsons incorrectly determined that Plaintiff had sprains, there is no evidence that she knew that he actually had fractures and disregarded any such fractures.  Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").  To the contrary, a fair-minded trier of fact could only reasonably conclude that Parsons identified a medical condition to Plaintiff's wrists and responded to that condition.  Parsons, a nurse, was not authorized to order an X-Ray.  Parsons had no further involvement in Plaintiff's care.  Accordingly, Parsons is entitled to summary judgment.[5]

The remaining Defendants also are entitled to summary judgment.   It is clear that Plaintiff sustained an injury to his wrists.  Parsons and Potochniak both concluded that the injuries were sprains; not fractures.  Assuming Parsons and Potochniak misdiagnosed Plaintiff's condition, that does not rise to the level of deliberate indifference.  Id.  This is especially true where the radiological consultations themselves give conflicting conclusions.[6]  Like Parsons, Potochniak assessed Plaintiff's wrists, evaluated his pain, determined that there was some improvement in his range of motion and pain and concluded that Plaintiff suffered a sprain.  As a result, Potochniak increased the dose of Plaintiff's pain killers and

---

[5] At the very least, Parsons is entitled to qualified immunity.

[6] Although the CT report concludes that Plaintiff did have left scaphoid fracture, an X-Ray report found no bone abnormality in either wrist.

advised Plaintiff to follow up in three to five days if the pain persisted.  To the extent that Plaintiff contends that Potochniak failed to schedule a follow-up appointment with a physician, that is insufficient to demonstrate deliberate indifference.  Hernandez v. Keane, 341 F.3d 137, 145-46 (2d Cir. 2003).  This conclusion is supported by the facts that: (1) Potochniak advised Plaintiff to return to the medical facility within three to five days if his pain continued, which he did not do; and (2) Plaintiff never later requested to be seen by a physician.

In opposition to the motion of summary judgment, Plaintiff contends that he repeatedly attempted to follow up, but he was ignored.  This is belied by the record evidence.  First, there is no evidence that Plaintiff was ignored by any of the *named* Defendants.  Without any such evidence, it cannot be said that they were personally involved in failing to respond to his repeated complaints.  Second, at deposition, Plaintiff was asked whether he had "a specific recall of filling any of those sick call requests out [for his wrists]."  Pl. Dep. at 33.  Plaintiff responded "no."  Plaintiff further was asked if he complained to the nurses who came around the pods to give medications.  Plaintiff responded "[y]eah, they would give me Tylenol or Advil, it was minor pain."  Id.  Plaintiff similarly testified that he did not recall ever returning to the nurse's station after November 6 and explain that his wrists were bothering him and that he wanted medical attention."  Id.  There are no medical records indicating that Plaintiff attempted to follow up with respect to his wrists.  In fact, Plaintiff was not next seen in the medical unit until November 16 in connection with headaches and stomach pains.  When asked at deposition whether he complained of wrist pain on November 16, Plaintiff testified "[t]he way I was feeling, most likely I did," id. at 34, "[w]henever I went to medical I was complaining about my wrists."  Third, to the extent that Plaintiff contends he continued to

complain, he testified at deposition that "the nurse come around with some cart type thing. . . . She just gave me pain killers, like Advil and stuff like that. . . ." Thus, the record evidences that Defendants did address, and did not disregard, Plaintiff's complaints.

In many ways, this case is similar to Estelle. In that case, the prisoner complained of lower back pain. The medical personnel prescribed bed rest, pain killers and muscle relaxants. The plaintiff contended that more should have been done by way of treatment or diagnosis such as, for example, taking an X-Ray. The Supreme Court stated that "whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice. . . ." Estelle, 429 U.S. at 107.

Here, Plaintiff complained of pain to his wrists. Defendants diagnosed his wrists and determined them to be strained. Plaintiff was given ice and pain killers and advised to report back if the pain continued. Plaintiff contends that more should have done, including taking an X-Ray. As in Estelle, however, whether an X-Ray was indicated is a classic matter for medical judgment and the failure to take an X-Ray does not constitute deliberate indifference. The same goes for Defendants' claimed failure to immediately immobilize Plaintiffs' wrists. Without any basis to believe that Plaintiffs' wrists were fractured, there was no reason to conclude that the wrists needed to be immobilized. Indeed, the finding on November 5 that Plaintiff had increased range of motion along with decreased pain and his report on November 6 that he felt fine and wanted to be released from the medical unit support the conclusion that Plaintiff did not suffer from a fracture.

Furthermore, this case only involves a period of time consisting of a maximum of 17 days. After this time, Plaintiff did received X-Rays and a cast, albeit at a different correctional facility. It cannot be said that this 17 delay in the provision of X-Rays or immobilization constituted deliberate indifference to a serious medical need.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED and Plaintiff's Complaint is DISMISSED. To the extent any state law claims remain, the Court declines to exercise supplemental jurisdiction. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated:March 6,2006

*Thomas J. McAvoy*
Thomas J. McAvoy
Senior, U.S. District Judge